Chief Judge Breitel.
In this declaratory judgment action brought by a franchised airport omnibus line, Carey, it attacks as unlawfully discriminatory bridge and tunnel toll rates imposed by the Authority. Defendant is a public authority created by the State to build, operate, and maintain various tunnels and bridges crossing the waterways separating parts of New York City. It is empowered by statute to fix its tolls and charges. Carey once sought in the action to apply principles of equal protection of the law but now, less ambitiously, would have applied standards of rate fixation, like those imposed by regulatory authorities upon regulated enterprises. On an agreed statement of facts, the action has thus far resulted in a Supreme Court judgment in favor of Carey, both declaratory and monetary, in the sum of $677,450.58, which the Appellate Division affirmed.
The issue is whether the Authority in fixing toll rates for the use of its facilities was empowered to distinguish between what it denominated and defined as general purpose franchised omnibus operations and special purpose franchised bus operations, and, based on this distinction, to charge higher tolls for the special purpose buses.
There should be a reversal, a declaration in favor of defend *549 ant, and a vacatur of the money judgment. The Authority is a governmental enterprise whose purpose is to operate its tunnels and bridges on economic principles, just as any entrepreneur might. Its charges and tolls were not and are not regulated by statute, or by regulatory authority, such as the Public Service Commission or such as the New York City Board of Estimate in its franchise-granting responsibility. The Legislature lawfully empowered the Authority to fix rates, without limitation, assuming no doubt that economic and political forces would control the exercise of the toll-charging function, subject always to legislative correction if the power were abused. It therefore could charge higher tolls to differentially classified tunnel and bridge users.
The thrust of Carey’s position is1 that, although it is a franchised public carrier, it is not charged the same toll rates as are some other franchised public carriers. Particularly, . Carey argues that tolls or charges must be related to the physical use of the Authority’s facilities and that in setting the tolls, the Authority must disregard whence the buses come, where they go, or the purpose of their travel.
Since 1936 the Authority has permitted a reduced rate for certain franchised public carriers. And since 1962 its rules and regulations have distinguished between "general purpose” buses and "special purpose” buses. General purpose buses, as the Authority defines them, are those franchised buses which are engaged in "general transportation” of the public. Only general purpose buses, which include some privately owned buses, qualify for lower rates. The Authority has classified as special purpose buses those, such as Carey’s, which travel between fixed stations to and from the airports. Other special purpose buses include those which carry members of the public between more or less fixed stations to and from beaches, raceways, and sports stadiums.
It is noteworthy that the tolls charged over the years to the special purpose buses have not been great, generally about twice as much as that charged the so-called general purpose buses, that is, 50 cents rather than 25 cents, and correspondingly in recent years as the tolls have been substantially increased.
The Authority defends its differential rates on the ground that it charges lower rates to general purpose franchised buses, both publicly and privately owned, because of its duty to encourage mass transportation. Variously, the Authority *550 has argued that the special purpose buses operate between fixed points and charge higher fares than are charged on general purpose buses.
Carey quite rightly points out that neither the nomenclature, the definitions, nor the scale of fares apply uniformly to the members of the two classes of bus operations. The Authority can hardly justify its differentials on a mass transportation hypothesis for, to be sure, special purpose buses in general, and an airport carrier in particular, serve species of mass transportation. Moreover, special commuter buses, both privately and publicly owned, qualify for the lower tolls while operating between fixed points and charging relatively high fares.
Nevertheless, the assumption underlying Carey’s argument is without basis. Carey somehow assumes that the Authority’s rates are subject to standards based on a "fair return on investment” or uniformity of rates charged the public, applicable in utility regulation. It argues that the courts must act in the absence either of a legislative standard or of regulation of the Authority’s rates by another regulatory public body. This argument assumes that tolls and charges must be uniform and must represent only an allocation of the cost of construction, maintenance, and repair of the physical facilities.
Both litigants unduly complicate the issue. The question is simply whether the Authority in the operation of its facilities may fix tolls and charges which in its judgment will best serve its economic goals and public policy goals, including economic differentiation among its charges so long as there is not involved any of the invidious discriminations condemned by statute or Constitution, or some utterly arbitrary discrimination not related to economic considerations or some accepted public goal.
A privately owned public utility, such as a railroad or electric plant, requires public regulation, politically and economically, and even at common law a privately owned public utility such as a common carrier was required to charge uniform rates (see, e.g., Hewitt v New York, New Haven & Hartford R. R. Co., 284 NY 117, 122). A publicly owned utility, of which the Authority is an example, is in no such situation. The fare history of the publicly owned subways in New York City is as good an example as any (cf. Klein v O’Dwyer, 192 Misc 421, 425-426 [Hecht, J.]). But of course the Legislature may and often does impose standards or regulation by other *551 public bodies on publicly owned utilities (e.g., Public Authorities Law, § 1029, subd 3 [Albany Light, Heat and Power Authority]; Village Law, §§ 12-1202, 12-1208; Public Service Law, § 66, subd 5; see Matter of Village of Boonville v Maltbie, 272 NY 40, 47-49).
At times, with respect to "unregulated” public authorities, the standard provided is with the intention that the enterprise not be profit making (Public Authorities Law, § 153, subd 10; § 153-b, subd 5; § 153-c [Jones Beach State Parkway Authority]; § 1005, subds 5, 6; see §§ 1001, 1001-a, 1014 [Power Authority of State of New York]). But more often the standard is relatively undefined, requiring only that charges be sufficient to cover expenses and obligations to bondholders or other creditors, if any (see, e.g., Public Authorities Law, § 578, subd 10 [Thousand Islands Bridge Authority]; § 703, subd 9; § 703-b [Ogdensburg Bridge Authority]; § 1054, subd 15 [Erie County Water Authority]). And at other times there is no standard imposed at all (see, e.g., § 654, subd 13 [Nassau County Bridge Authority]; § 828, subd [e] [Central New York Regional Market Authority]; § 879, subd 12 [Genesee Valley Market Authority]).
Carey makes something of the argument that there has been an improper delegation of power to the Authority, if its toll-fixing power is substantially untrammeled. Historically rate fixing is a legislative power which the Legislature may delegate (e.g., Matter of Village of Saratoga Springs v Sara-toga Gas, Elec. Light & Power Co., 191 NY 123, 146-151; see Meyers v New York State Div. of Housing & Community Renewal, 36 AD2d 166, 170-171). It is not to be confused with the delegation of other governmental powers which, if delegated, must be confined by limiting standards (see, e.g., Packer Collegiate Inst. v University of State of N. Y., 298 NY 184, 189-191).
The resolution of the issue must therefore be developed by examining the history and legal structure under which the Authority was created and functions.
In New York City Tunnel Auth. v Consolidated Edison Co. of N. Y. (295 NY 467, 476) this court stated that an authority, in setting and collecting charges for the use of its facilities, was engaged in a governmental function which therefore did not require it to compensate privately owned public utilities for displacement of their cables, pipes, and the like. In so holding the court in dictum commented, perhaps not with *552 meticulousness, that in exercising a toll-fixing power it was exercising a taxing power to carry the cost of the improvement.
Assuming, doubtfully, that this be true, then the scope of classification is broad indeed and need not follow the restrictive tests associated with other forms of rate charging (see Ampco Print-Advertisers’ Offset Corp. v City of New York, 14 NY2d 11, 24, app dsmd 379 US 5). As this court stated in People ex rel. Hatch v Reardon (184 NY 431, 445, affd 204 US 152) "[arbitrary selection and discrimination characterize the history of [tax] legislation.” This is subject to the limitation that a tax classification will not be sustained where " 'so purely arbitrary as to have no reason, not even an insufficient or merely plausible reason, to justify it’ ” (Matter of Keeney, 194 NY 281, 286). There is a great body of authority sustaining distinctions no less exact or perfectly defined than those involved in this case (e.g., Matter of Roosevelt Raceway v County of Nassau, 18 NY2d 30, 38-40; see, also, New York R. T. Corp. v City of New York, 303 US 573, 578, 581-586, affg 275 NY 258). This is on the view, arguendo, that tolls charged by an authority are akin to taxes. A more refined analysis, however, suggests that as a toll collector the Authority is more akin to an entrepreneur than a tax collector, in which event it is even less limited, if that were conceivably possible, in classifying the users of its facilities for toll-charging purposes.
The Authority in its original form was created in 1933 to construct the Triborough Bridge (L 1933, ch 145, § 3, subd 9). The New York City Tunnel Authority, a similar Authority initially responsible for both the Brooklyn Battery Tunnel and the Queens Midtown Tunnel, was created in 1936 (L 1936, ch 1). The two Authorities were eventually merged. The statutes then, and the surviving statute still empowers the toll-collecting Authority to establish and collect tolls for the use of the facilities it constructs and maintains (Public Authorities Law, § 553, subd 12).
The Authority statute has since 1939 provided how surplus funds should be used (L 1939, ch 874, § 2). Moreover, the Authority has always been authorized to use surplus funds derived from one project for its other project or projects. And since 1968 it may also transfer surplus funds to the Metropolitan Transportation Authority or New York City Transit Authority (Public Authorities Law, § 553, subd 12). Hence, the *553 Legislature has granted an unlimited toll-fixing power to the Authority with explicit provision for a surplus, and, indeed, since 1968, an expectation that at least a part of any surplus be used for subsidizing general mass transportation. This is strong support for the proposition that the Authority when acting in its toll-fixing capacity is to act much like an entrepreneur might, letting economic forces and the maximizing of profit be at least in part its guide.
This rather broad power is of course subject to legislative correction when abused. The courts are not, however, appropriate to make such correction, if the Legislature has chosen to confer unfettered discretion (see Matter of Russell v Jones Beach State Parkway Auth., 80 Misc 2d 698, 700). Moreover, the Legislature has responded with corrective legislation when correction was deemed necessary; one correction arising indeed in the very context of the facts presented in the Russell case (supra) (Public Authorities Law, § 153-c [Jones Beach State Parkway Authority]).
Since 1936 the Authority has granted lower tolls to certain franchised public buses, for an earlier period at the rate charged for private passenger motor vehicles. Although in establishing its toll classifications the Authority has had definitional problems, it has always been and still is clear that it charges a higher toll to franchised buses serving airports, beaches, raceways, and sports stadiums. Its difficulty has stemmed from its incapacity to distinguish at an abstract level with meticulous definitions between such "special purpose” buses and others. But this difficulty does not circumscribe its unfettered discretion to fix tolls as it will so long as invidious illicit discriminations are not practiced and differentials are not utterly arbitrary and unsupported by economic or public policy goals, as it reasonably conceives them.
Assuming that somehow the Authority’s power to set and collect rates must be exercised on some uniform basis within classes of users of its facilities, the Authority has not violated any principles of classification.
In many respects special purpose buses are distinguishable as the luxury subgroup of public franchised buses. Buses serving beaches, airports, raceways, and sports stadiums are associated with recreational travel or with high cost means of interurban, national, or international travel. True, they may not be distinguishable on the bases of the number of axles, availability to the public, limited or nonstop travel, or, in *554 some few instances, the higher fares charged. The "special purpose” buses are, nevertheless, distinguishable. They are not vehicles in mass transportation simply to move passengers between their homes and places of work, visiting or shopping within the City of New York and its immediate environs. Beyond these general, that is, common, periodic, and often daily purposes the passengers do use the special purpose buses for the passenger’s special purpose, most often without periodicity and at separated irregular time intervals.
The so-called general purpose buses, however a few of them may share some characteristics with the "special purpose” buses, are forms of mass transportation from place to place in the course of daily life, usually regardless of the purpose of the passengers. This is so even if airport buses, or raceway buses for that matter, are also used to take some people periodically or even daily between their homes and their places of work at the airports or the raceways. To differentiate toll charges according to the purpose of most of the passengers is a permissible basis (cf. Burton v Monticello & Burnside Turnpike Co., 162 Ky 787, 794). A definition of class is not required to be so perfect that some members of the class may not depart from its definitional norms (see Montgomery v Daniels, 38 NY2d 41, 61-62).
It is of significance, too, that Carey concedes, as it must, that the City of New York, in charging private bus lines franchise fees, usually a percentage of gross revenue, for use of its streets, negotiates and imposes differential charges. It does so both with respect to Carey and the other franchise operators with whom Carey demands equality of treatment by the Authority. Indeed, the parallel of separate negotiation extends to the permits that Carey and the other bus lines obtain to use the Authority facilities. Each of the permits is separately negotiated by the permit holder with the Authority, and each contains differential conditions, particularly with respect to schedules and headway between buses during rush and off hours. It is difficult to see why, if such differentials are valid and tolerable, differentials are not valid and tolerable with respect to bridge and tunnel tolls.
Finally, except for its ipse dixit, Carey does not show why tolls must bear some relation to the physical use of the Authority’s physical facilities. This may represent no more than a confusion with privately owned public utility rate regulation where constitution and statute require a fair re *555 turn to the utilities, in which capital costs, however based, and unit cost of operation are ingredients in the rate-fixing formula (e.g., Matter of General Tel. Co. v Lundy, 17 NY2d 373, 381-382). If Carey’s position is based on the statutory language which authorizes tolls for the "use” of the Authority facilities, the reading is too restrictive. The language simply means that the toll is triggered by the use, and not otherwise, and offers no basis for inferring that the toll is to be cost related to the physical use. No one would suggest that toll highways could not impose a uniform charge for a long or short distance, or conversely, different charges for long and short distances, or that franchised privately owned public buses could not be limited or permitted to charge uniformly for a long or short distance, or conversely, as in many cities, charge varying fares for long and short distances. The factors are generally economic, related to what even amateur economists are acquainted with as the law of monopoly price, and of course with heavy weight are the factors based on a diverse range of public policies. Even railroad freight as well as passenger rates are often influenced by such factors and a single formula absolutely applied is never present in determining a rational uniformity of rates in rate regulation or rate fixation. The same may be said about rates for air freight and air passengers, and for transportation by water, and indeed for the fares Carey or other franchised bus operators charge or are permitted to charge its passengers.
The short of it is that the issues in this case reduce themselves to misclassifications of the problems addressed and to a logomachy over definitions. The shallowness of the issues may well explain the six-year hibernation of this litigation, between 1966 when the action was begun and 1972 when it was reinvigorated.
Accordingly, the order of the Appellate Division should be reversed, with costs in all courts to appellant Authority, the orders and judgments of Supreme Court, New York County, vacated, and judgment granted in favor of appellant Authority declaring that the tolls and charges set and collected by the Authority with respect to plaintiff-respondent have been and are valid.