PORT AUTHORITY TRANS-HUDSON CORP., PLAINTIFF, v.
BAUM BUS COMPANY, INC., *ET AL.*, DEFENDANTS AND
THIRD-PARTY PLAINTIFFS, v. CITY OF JERSEY CITY,
THIRD-PARTY DEFENDANT.

Superior Court of New Jersey
Law Division

Decided January 12, 1977.

*Mr. Hugh H. Welsh* for plaintiff (*Mr. Francis A. Mulhern,* attorney).

*Mr. Michael D. O'Shea* for defendants and third-party plaintiffs (*Messrs. Waters, McPherson & Hudson,* attorneys).

*Mr. Paul W. Mackey* for third-party defendants (*Mr. Dennis L. McGill,* Corporation Counsel, attorney).

*Mr. Arthur T. Vanderbilt II* for intervenors, Board of Public Utility Commissioners (*William F. Hyland,* Attorney General, attorney).

TARLETON, J. S. C. Plaintiff Port Authority Trans-Hudson Corporation (PATH), defendants Baum Bus Company, Inc., *et al.* and third-party defendant City of Jersey City have moved for summary judgment. Defendants have also

moved to stay further action in the case pending a final determination of the Board of Public Utility Commissioners (PUC) based upon a petition filed on September 16, 1975 and later amended on June 10, 1976.

PATH's complaint alleges that it established a schedule of charges for the use of the Journal Square Transportation Center bus facility; that defendant bus companies have been using this facility since April 7, 1975 and have refused to pay use charges despite numerous demands by PATH.

Defendants have answered and counterclaimed. In their answer they contend that PATH lacks the power to levy charges, claiming that such lies within the jurisdiction of the PUC; that the charges are based upon an illegal contract between PATH and Jersey City, and that they have been subjected to economic duress by PATH's illegal acts.

Defendants' counterclaim alleges that in October 1967 PATH and Jersey City entered into an agreement which obligated PATH to construct the Transportation Center and the city to eliminate certain bus stops in the Journal Square area; that Jersey City passed an ordinance eliminating several bus stops on defendants' route and that PATH "fraudulently induced" the city to enter into the agreement by misrepresenting that the Transportation Center would be economically feasible. Defendants seek an accounting of all funds received and spent on construction of the Transportation Center and a judgment declaring that the agreement is either void as contrary to public policy or voidable for lack of consideration.

Defendants also contend that elimination of the bus stops constituted a taking of property without due process and without just compensation, in violation of the Federal and State Constitutions. Defendants recently expanded the constitutional argument to include a claim of denial of equal protection of the law.

Defendants filed a third-party complaint against Jersey City, alleging that the elimination of the bus stops was

illegal; that the agreement with PATH recited no consideration to Jersey City; that it amounted to a usurpation of a future legislative function and constituted a taking of property without due process and just compensation, in violation of the State and Federal Constitutions.

Defendants' petition filed with PUC seeks an order compelling the city to re-establish the eliminated bus stops, compelling PATH to cease and desist in its efforts to collect charges imposed upon defendants for use of the Transportation Center or, in the alternative, for a hearing on the reasonableness of the charges and "these matters."

On October 8, 1976 leave was granted PUC to intervene. PUC takes no position on the question of charges but urges that the case be stayed to enable it to make factual findings to determine the extent of its jurisdiction with respect to the elimination of the bus stops.

In addition to the affidavits filed with the motion papers, I requested and received the following material:

(a) An exhibit map of Jersey City depicting the Transportation Center and location of the ten eliminated bus stops;

(b) Jersey City Ordinances J–512 and J–513;

(c) Agreement dated January 20, 1967 between Jersey City and PATH;

(d) The January 29, 1962 proposal pertaining to the Hudson and Manhattan World Trade Center project;

(e) Rules and regulations of the Journal Square Transportation Center dated April 4, 1975;

(f) Schedule of charges for use of bus facilities of the Journal Square Transportation Center dated April 7, 1975;

(g) Affidavit of Jack Rosen, Director of the Terminals Department of the Port Authority, dated November 15, 1975, recommendation and report, bar graph.

After completion of construction of the Transportation Center, and on February 18, 1975, Jersey City, by Ordi-

nances J–512 and J–513, abolished certain bus stops in the Journal Square area.

By resolution of February 13, 1975 PATH's board of directors adopted a schedule of charges for the use of the bus facilities of the Transportation Center. The minutes of the board of directors' meeting of February 13, 1975 containing the resolution adopting the schedule of charges were forwarded to the Governors of New York and New Jersey for approval as provided by *N. J. S. A.* 32:1–35.62, *N. J. S. A.* 32:2–6 to 32:2–9.

The relevant portion of the schedule called for a charge of 50 cents for each bus departure operating on a route originating and terminating at Journal Square. The 50-cent charge was arrived at after consultation with the Department of Transportation of New Jersey and a study conducted on behalf of PATH pertaining to the cost of providing bus facilities at the Transportation Center.

According to PATH's analysis, and based upon projected costs of the bus terminal portion of the Transportation Center, it was anticipated that the expense to PATH per bus round trip would be $2.05. In structuring the bus charges no attempt was made to recoup any portion of federal aid provided for construction of the Transportation Center or for land acquisition costs. According to PATH's calculations, the elimination of debt service from expenses would reduce the expense per bus round trip to the terminal to $1.38, a charge considered still excessive in light of the need to encourage use of the Transportation Center and the public benefits to be obtained from use by bus companies. The charges ultimately adopted for use of the Transportation Center are less than that being charged for allegedly similar service at the Port Authority Bus Terminal and the George Washington Bridge Bus Station in New York.

Rules and regulations for the Transportation Center were adopted April 7, 1975 and these, among other things, provided that any charges adopted and applicable be supported

by the user's records and books of account and subject to audit by PATH.

Defendant Lafayette-Greenville Bus Owners Association is comprised of 19 individual corporate members operating as bus companies in Jersey City under franchises granted by PUC. The Association was formed to share operating expenses on a pro rata basis, coordinate the schedules of its members and act as bargaining agent for labor negotiations. The affidavit of its president discloses that along with representatives of other bus companies he attended a meeting in late 1974 or early 1975 at Jersey City City Hall. At this meeting the bus companies were informed that buses would be routed through the Transportation Center and the charge for each trip would be in excess of $2. Defendants' president attended another meeting at the Transportation Center in February or March 1975, at which time the bus companies were informed that the charge for use of the Transportation Center would be 50 cents and that bus stops around Journal Square were to be eliminated. Defendants' president attended another meeting at Jersey City City Hall on April 4, 1975 and joined in voicing objection to the loss of bus stops and the 50-cent charge for the use of the Transportation Center.

These defendants have operated their buses from assigned platform 4D in the Transportation Center since April 7, 1975. For the period from April 7, 1975 to May 31, 1976 defendants' buses have totalled 33,528 departures from the Transportation Center, which, based upon a 50-cent departure charge, amounts to $16,764. According to the affidavit of PATH's senior auditor, as of September 30, 1976 defendants' use charges amounted to $21,505.50 and continue.

## JURISDICTION

◼ The background preceding construction of the Journal Square Transportation Center appears in *Terminal Enter-*

*prises, Inc. v. Jersey City,* 54 *N. J.* 568 (1969). Among other things, *Terminal Enterprises* established that PATH has statutory authority to construct and operate the Transportation Center and does so as a public agency performing an essential governmental function. *Id.* at 575, 576.

*N. J. S. A.* 32:1–35.52, in pertinent part, provides:

In furtherance of the aforesaid findings and determinations and in partial effectuation of and supplemental to the comprehensive plan heretofore adopted by the 2 said States for the development of the said port district, *the port authority is hereby authorized and empowered to establish, acquire, construct, effectuate, develop, own, lease, maintain, operate, improve and rehabilitate a project herein referred to as the port development project,* which shall consist of a facility of commerce herein referred to as the world trade center, to be located within the Hudson tubes-world trade center area, and railroad facilities herein referred to as the Hudson tubes and the Hudson tubes extensions. The port authority shall proceed as rapidly as may be practicable to accomplish the purposes of this act. *The port authority is hereby authorized and empowered to establish, levy and collect such rentals, tolls, fares, fees and other charges as it may deem necessary, proper or desirable in connection with any facility or part of any facility constituting a portion of the port development project* and to issue bonds for any of the purposes of this act and to provide for payment thereof, with interest upon and the amortization and retirement of such bonds, and to secure all or any portion of such bonds by a pledge of such rentals, tolls, fares, fees, charges and other revenues or any part thereof * * *. [Emphasis supplied]

*N. J. S. A.* 32:1–35.61, in pertinent part, provides:

*All details of the effectuation, including but not limited to details of financing, leasing, rentals, tolls, fares, fees and other charges, rates, contracts and service, of the world trade center, the Hudson tubes and the Hudson tubes extensions by the port authority shall be within its sole discretion and its decision in connection with any and all matters concerning the world trade center, the Hudson tubes and the Hudson tubes extensions shall be controlling and conclusive.* The local laws, resolutions, ordinances, rules and regulations of the city of New York shall apply to such world trade center if so provided in any agreement between the port authority and the city and to the extent provided in any such agreement.

> So long as any facility constituting a portion of the port development project shall be owned, controlled or operated by the port authority (either directly or through a subsidiary corporation incorporated for any of the purposes of this act), *no agency, commission or municipality of either or both of the 2 States shall have jurisdiction over such facility nor shall any such agency, commission or municipality have any jurisdiction over the terms or method of effecutation of all or any portion thereof by the port authority* (or such subsidiary corporation) including but not limited to the transfer of all or any portion thereof to or by the port authority (or such subsidiary corporation). [Emphasis supplied]

I find these legislative enactments to be clear and unambiguous expressions vesting in PATH the authority and power to establish the disputed charges for defendants' use of the Journal Square Transportation Center. Therefore, there is no need to indulge in any interpretation or construction other than that called for by the express words set forth. *Duke Power Co. v. Patten,* 20 *N. J.* 42, 49 (1955); *Braband v. Neeld,* 35 *N. J. Super.* 42, 52 (App. Div. 1955).

The opposing arguments marshalled by defendants and PUC are unpersuasive. Rather than support defendants' position I conclude that *N. J. S. A.* 32:1–9 seriously undermines it because here the Legislature has "otherwise provided." *N. J. S. A.* 32:1–35.52, *N. J. S. A.* 32:1–35.61.

The same conclusion follows with respect to defendants' invocation of *N. J. S. A.* 32:1–35.56 since it in no way derogates from PATH's imposition of charges for use of the Transportation Center.

The cases relied upon by defendants are also distinguishable:

*Port of New York Authority v. Public Service,* 76 *N. J. Super.* 359 (Law Div. 1962), rev'd *sub nom. Port of New York Authority v. Hackensack Water Co.,* 41 *N. J.* 90 (1963), determined that under the common law a utility was obliged to shoulder the cost of relocating its facilities even when necessitated by governmental action. While declining to decide the case on the issue of delegation of power to the Port Authority, the court specifically stated that if

the case turned on that issue it would so find. 41 *N. J.* at 96.

*Public Service Ry. Co. v. Bd. of Public Utility Comm'rs,* 276 *F.* 979 (D. N. J. 1927), and *Bergen Cty. v. Dep't of Public Utilities,* 117 *N. J. Super.* 304 (App. Div. 1971), each dealt with matters within PUC's jurisdiction, which is in contrast to the instant case.

*Edison Storage Battery Co. v. Public Utility Bd.,* 93 *N. J. L.* 301 (Sup. Ct. 1919) and *Hackensack Water Co. v. Public Utility Bd.,* 96 *N. J. L.* 184 (E. & A. 1921), are not in point.

Defendants' remaining argument — that a toll which has the effect of denying it a fair rate of return is just as impermissible as an unreasonably low rate fixed by a public utility commission (citing *In re Interstate Industrial Sand Rates,* 66 *N. J.* 12 (1974)) is devoid of merit since it is bottomed upon the erroneous premise that PUC is empowered to supervise PATH's establishment of charges for defendants' use of the Transportation Center.

The Port Authority is a bi-state agency created by the legislatures of New York and New Jersey to meet "the immediate need for maintenance and development of adequate railroad facilities" between the two states and to provide for "transfer of * * * passengers to and from other transportation facilities." *N. J. S. A.* 32:1–35.50(4). To aid it in accomplishing this objective the legislatures delegated to the Port Authority the authority and power to establish charges for use of the Transportation Center. *N. J. S. A.* 32:1–35.52, *N. J. S. A.* 32:1–35.61. To subject PATH to the supervision of PUC in establishing charges for use of the Transportation Center would run counter to the express provisions of the compact between the two states.

## ELIMINATION OF BUS STOPS

In *Terminal Enterprises, supra,* the Supreme Court recognized that the goal of a central transportation facility

could not be attained "unless buses which stopped in the area were instead routed into the terminal." 54 *N. J.* at 576. Clearly implicit in the opinion is the right of the city to eliminate bus stops to accomplish the legislative goal. *N. J. S. A.* 32:1–35.57. When viewed in this light, and considering *N. J. S. A.* 39:4–197(3),(a) which authorizes a municipality to designate bus stops and *N. J. S. A.* 40:48–2 which empowers a municipality to enact ordinances in furtherance of the general welfare, I conclude that elimination of the ten bus stops was an essential component of the city's agreement with PATH without which the legislative goal could not be achieved.

To accept the contentions of defendants and PUC that PUC is authorized to review and reassess elimination of the ten bus stops to determine whether or not such is in the public interest runs counter to the legislative intent expressed in *N. J. S. A.* 32:1–35.57 and the views of *Terminal Enterprises, supra.*

*N. J. S. A.* 32:1–35.51 defines the Journal Square terminal area as:

\* \* \* the area in the city of Jersey City, State of New Jersey, bounded generally by Journal Square, Hudson boulevard, Pavonia avenue, Summit avenue, and Sip avenue, together with such additional contiguous areas as may be agreed upon from time to time between the port authority and the said city; \* \* \*.

Exhibit map (a) clearly establishes that the ten eliminated bus stops fall within the foregoing definition: three are on Summit Avenue, two on Sip Avenue, four on Hudson Boulevard and one in Journal Square.

The issues raised herein do not call for the expertise undeniably possessed by PUC, and I find no merit in PUC's argument that factual findings must be made to determine the scope of the city's power to eliminate the ten bus stops in issue.

Defendants and PUC also rely upon the following statutes and administrative code provisions to support their thesis

that PUC either has exclusive or concurrent authority to eliminate bus stops or, in the alternative, that the determination of whether the elimination of the ten bus stops without its approval is valid should be stayed until it can determine the scope of its power over this subject matter:

*N. J. S. A.* 48:2–13 (PUC shall have general supervision and regulation of and jurisdiction over all public utilities);

*N. J. S. A.* 48:2–14 (no franchise granted to a public utility by a political subdivision of the State is valid until approved by PUC);

*N. J. S. A.* 48:4–3 (no autobus operation is permitted to function in New Jersey unless there is a certificate of public convenience and necessity signed by PUC);

*N. J. S. A.* 48:4–3.1 (nothing in this act shall preclude PUC from imposing conditions upon a certificate of public convenience and necessity as to the area and route of operation);

*N. J. S. A.* 48:2–24 (a public utility shall not discontinue, curtail or abandon any service without obtaining permission from PUC after notice);

*N. J. S. A.* 48:2–32.2 (providing for a hearing whenever a state agency shall schedule public hearings related to proposed changes or curtailment of public passenger transportation service);

*N. J. S. A.* 48:2–56(F)(3) (setting forth the amount of fees and charges PUC is entitled to collect for changes, extensions or consolidation of existing autobus routes);

*N. J. A. C.* 14:4–1.2 (there shall be no deviation from the approved route without the approval of PUC except in cases of emergency);

*N. J. A. C.* 14:4–1.3 (autobus shall not discontinue the operation of a route or routes or a portion thereof until approval is given by PUC).

In my analysis the cited statutes and administrative code provisions do not sustain defendants' or PUC's position.

In addition, defendants and PUC rely upon *In re Petition of Public Service,* 103 *N. J. Super.* 505 (App. Div. 1968),

in support of their exclusivity arguments. Unlike the instant case, PUC was there vested with jurisdiction over the subject matter (combining already existing and authorized bus routes). The elimination of bus stops and routing buses through the Transportation Center, like provisions for parking and the closing of streets, were aimed at effecting an efficient operation of the Transportation Center and at reducing traffic, and "were plainly the kinds of terms which the Legislature contemplated." *Terminal Enterprises, supra,* 54 *N. J.* at 576.

Likewise, in my view *In re Public Service Electric and Gas Co.,* 35 *N. J.* 358 (1961), does not support PUC's contention that since the city has not been granted specific statutory authority to eliminate bus stops, it exceeded the scope of its powers. *Public Service* dealt with a municipal ordinance requiring all electric power lines within the municipality carrying more than a specified amount of voltage to be installed underground. The ordinance was held invalid for lack of any specific authority. In doing so the court observed that the transmission of electric power requires uniform regulation. If each municipality were allowed to determine the manner in which a power line is to be installed, "nothing but chaos would result." *Id.* at 373. It therefore concluded that the case was "one for Board control alone." *Id.*

The case at bar is in direct contrast since Jersey City does possess the requisite authority to designate bus stops. *N. J. S. A.* 39:4–197(3)(a); *Terminal Enterprises, Inc. v. Jersey City, supra; N. J. S. A.* 32:1–35.51, *N. J. S. A.* 32:1–35.66, *N. J. S. A.* 32:1–35.50, *N. J. S. A.* 32:1–35.57.

## CONSTITUTIONAL ARGUMENTS

Defendants' constitutional attack is focused upon the contentions that they were entitled to a hearing; elimination of bus stops and imposition of tolls constitutes a deprivation of property without due process or just compensation and a resultant denial of equal protection of the law.

The Legislature has delegated to PATH the authority to determine charges for defendants' use of the Transportation Center. *N. J. S. A.* 32:1–35.52. *N. J. S. A.* 32:1–35.61. PATH therefore has discretion to determine the amount of such charges, provided that the charges are not illicitly discriminatory or arbitrary. *Cary Transportation, Inc. v. Triborough Bridge, etc.,* 38 *N. Y.* 2d 545, 381 *N. Y. S.* 2d 811, 345 *N. E.* 2d 281 (Ct. App. 1976), *cert.* den. 429 *U. S.* 830, 97 *S. Ct.* 90, 50 *L. Ed.* 2d 93 (1976). In determining the amount of charges for use of the Transportation Center PATH was performing a delegated legislative function which did not entitle defendants to a hearing. *Jamouneau v. Harner,* 16 *N. J.* 500, 522 (1954), *cert.* den. 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955); *State Bd. of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (E. & A. 1935).

Compare, however, *Cunningham v. Civil Service Dep't,* 69 *N. J.* 13 (1975) where two public employees were demoted when their positions were eliminated upon reorganization of the Department of Transportation. Later the Department created a new position to which the demoted employees claimed entitlement as a preemptive right by virtue of statutes providing that when an employee is demoted because of abolition of his job, he shall be reinstated in the same or any comparable position. The Supreme Court held that the employees were entitled to a hearing to determine whether the newly created position involved the same or comparable functions, duties and responsibilities to those previously carried out by plaintiffs. In its opinion the court discussed at length the legislative-judicial function dichotomy.

Applying the *Cunningham* analysis to the instant case I conclude that a hearing was not required. In 1921 the States of New York and New Jersey entered into a compact creating PATH. The function of PATH was set forth in Article IV of the compact:

The port authority shall constitute a body, both corporate and public with full power to purchase, construct, lease and/or operate any terminal or transportation facility within said district and to make charges for the use thereof; * * *. [*N. J. S. A.* 32:1–7]

In furtherance of this purpose the Legislature in 1962 authorized the Port Authority or its subsidiary PATH to acquire and operate the Hudson and Manhattan Railroad Co. and to improve the railroad's terminals "to permit transfer of its passengers to and from other transportation facilities." *N. J. S. A.* 32:1–35.50; *Terminal Enterprises, supra,* 54 *N. J.* at 572. To achieve these objectives Port Authority was authorized and empowered to "establish, levy and collect such rentals, tolls, fares, fees and other charges as it may deem necessary, proper, or desirable in connection with any facility or part of any facility * * *." *N. J. S. A.* 32:1–35.52.

In exercising the powers delegated to it with respect to the Transportation Center PATH acts much like a private business operation in the maintenance, management and operation of the facility. *State v. Daquino,* 56 *N. J. Super.* 230, 238 (App. Div. 1959), certif. den. 30 *N. J.* 603 (1959), cert. den. 361 *U. S.* 944, 80 *S. Ct.* 407, 4 *L. Ed.* 2d 363 (1960) ; *Carey Transportation, Inc. v. Triborough Bridge, etc., supra,* 381 *N. Y. S.* 2d at 814, 345 N. E. 2d at 284. The determination of use charges requires the exercise of judgment and discretion and is an activity that fairly may be classified as legislative. The ascertainment of charges involves consideration of myriad factors and the exercise of discretion by PATH to achieve the overall legislative purpose and to operate the Center in an efficient manner. The relevant inquiry is not an adjudicative one; rather, it is a legislative one. *Cunningham, supra,* 69 *N. J.* at 22.

Here the tolls are imposed upon a class or group, *i.e.,* all bus companies using the Transportation Center. Unlike the Department of Transportation determination in *Cunningham,* PATH's action in establishing the charges was not targeted or directed at any specific individual. The instant case is also to be distinguished from one involving the regu-

lation of rates to be charged by a public utility where particular facts about the utility must be taken into account, such as expenses, property valuation, income, etc.—an adjudicative process. *Public Service Coordinated Transport v. State*, 5 *N. J.* 196, 216 (1950) ; *Yellow Cab Corp. v. Passaic City Council*, 124 *N. J. Super.* 570, 580 (Law Div. 1973) ; 1 *Davis, Administrative Law*, § 7.03 at 416 (1958).

In contrast, the present case deals not with the financial condition of the bus companies using the Transportation Center but with business and other considerations which relate to the efficient management of the facility consistent with achieving the legislative goal. To be sure, PATH is under a duty to act reasonably, *Terminal Enterprises, supra,* 54 *N. J.* at 577, and there is a necessity for compiling an adequate record for judicial review even where the determination is legislative in nature. *Bailey v. Council of the Div. of Planning,* 22 *N. J.* 366 (1956).

At oral argument I requested information on the details leading to setting the 50-cent fee. At the court's request PATH submitted the affidavit of Jack Rosen, the Director of the Terminals Department of the Port Authority. Accompanying the affidavit was a report with recommendations submitted prior to adoption of the resolution setting the charges, and a bar-type graph outlining PATH's expenses for bus facilities at the Transportation Center.

These documents disclosed that in 1974 the Terminals Department of PATH completed a study of the cost of providing bus facilities at the Transportation Center. This study determined that the total expense for a single round trip was $2.05. When debt service was eliminated from this calculation the total expense per bus trip was $1.38, but even this diluted figure was regarded as "an excessive charge in light of the need to encourage carrier use of the public bus facilities to produce the public benefits of expediting the interchange of bus and rail patrons and alleviating traffic congestion in Journal Square."

The report also discloses that the short haul carriers operating from the midtown Port Authority Bus Terminal in New York City and the George Washington Bridge Bus Station pay a start charge of $1.20 for space and services comparable to those available at Journal Square. However, it was felt to be "unfair to impose on intrastate bus carriers operating out of Journal Square a charge exceeding that paid by carriers operating from Manhattan. At a fee of 50 cents per round trip PATH is absorbing over 75% of the cost of providing new mass transportation services for the Journal Square bus commuter."

In view of the foregoing I find that PATH acted reasonably in setting the charges for the Journal Square transportation bus center facilities. That schedule calls for a charge of 50 cents for each bus departure operated on a route which originates and terminates at Journal Square and 25 cents for each departure operated on a through route. No fee is payable on bus arrivals and, as stated in the report accompanying the resolution, "the charge is a uniform 50 cents per bus round trip on all routes."

Nothing has been submitted by way of affidavit or otherwise to support defendants' contention that PATH acted unreasonably or arbitrarily in establishing the charges. The burden rests upon defendants to demonstrate the unreasonableness of PATH's action. *Cf. American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 126 *N. J. Super.* 577, 589–590 (App. Div. 1974), aff'd 66 *N. J.* 258 (1974). That burden has not been sustained.

In light of the foregoing circumstances I find no merit to defendants' constitutional challenge, observing that no cases have been cited to support the equal protection argument. *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934); *Peoples Rapid Transit Co. v. Atlantic City,* 105 *N. J. L.* 286 (Sup. Ct. 1928), aff'd o.b. 106 *N. J. L.* 587 (E. & A. 1930); *Penn-Jersey Rapid Transit Co. v. Camden,* 6 *N. J. Misc.* 813, 142 *A.* 821 (Sup. Ct. 1928); *Terminal Enterprises, Inc. v. Jersey City, supra.*

Accordingly, the motions for summary judgment on behalf of PATH and the City of Jersey City are granted; the motion for summary judgment on behalf of defendants is denied as is defendants' motion to stay the case.