■ In the Matter of PROMETHEUS REALTY CORP. et al., Respondents, v NEW YORK CITY WATER BOARD et al., Appellants. [48 NYS3d 318]—

Judgment (denominated an order), Supreme Court, New York County (Carol R. Edmead, J.), entered June 21, 2016, annulling and vacating respondents' resolutions approving a 2.1% increase to the water rates for fiscal year 2017 and a one-time credit of $183 for a class of ratepayers, affirmed, without costs.

In this CPLR article 78 proceeding, respondents New York City Water Board (Water Board) and the New York City Department of Environmental Protection (DEP) appeal from a judgment granting the petition to annul and vacate the Water Board's resolution approving a 2.1% increase to the water rates for Fiscal Year 2017 along with a one-time $183 credit to "Class 1" property owners of one-, two-, and three-family homes. Petitioners contend that the Water Board's actions are ultra vires, but even if they are not, the rate increase adopted and credit issued to some, but not all, of its customers are without a rational basis and, therefore arbitrary.

The Water Board is a public benefit corporation that func-

tions independently of other branches of City Government (Public Authorities Law §§ 1045-f [1]; 1045-g). The primary functions of the Water Board include establishing and collecting water and sewer charges and other revenues to raise sufficient funds to operate and maintain the City's water system. In addition, the Water Board is responsible for raising revenues to support debt issued by the Water Finance Authority to finance the water system's capital program to improve and maintain the water system infrastructure. The Water Board is statutorily mandated to "establish, fix, revise, charge and collect and enforce the payment of all fees, rates, rents and other service charges" necessary for the operation and maintenance of the water and sewage systems in New York City (Public Authorities Law § 1045-g [4]; *Giuliani v Hevesi*, 90 NY2d 27, 34 [1997]). In accordance with Public Authorities Law § 1045-h, since 1985, the Water Board has paid rent to lease the water system from the City. The City's DEP has acted as the Water Board's billing agent. Revenues collected from the water system customers are used to fund, among other things, the rent payments due to the City and reimburse DEP for its administrative duties. The Water Board is directed to collect revenues that are at least sufficient to make the water system financially self sustaining (Public Authorities Law §§ 1045-g [4]; 1045-j).

The Water Board is the "sole authority" empowered to set the rates it charges its customers for their water and sewage usage (*Perry Thompson Third Co. v City of New York*, 279 AD2d 108, 115 [1st Dept 2000], citing *Matter of Village of Scarsdale v Jorling*, 91 NY2d 507, 515 [1998]). Despite such broad powers, the Water Board's authority is not without limits. A rate-fixing determination by any agency must still have a rational basis and reasonable support in the record (*see Matter of Abrams v Public Serv. Commn. of State of N.Y.*, 67 NY2d 205, 212 [1986]). In the case of water and sewer charges, public hearings must be held before the Water Board acts (Public Authorities Law § 1045-j [3]). Any rate structure ultimately approved by the Water Board must be consistent with its statutory authority and mandate (*see Giuliani v Hevesi* at 34; *see also Matter of Medical Socy. of State of N.Y. v Serio*, 100 NY2d 854, 864 [2003]; *Boreali v Axelrod*, 71 NY2d 1, 9 [1987]; *Matter of Leon RR*, 48 NY2d 117, 126 [1979]). According to the Water Board, its mission is to "establish rates for and distribute the collected revenues of the Water and Sewer System of the City of New York, proactively considering the optimal level to achieve efficient financing of the System's infrastructure and sustainable provision of high-quality service at a fair price for our customers" (New York City Water Board, New York City Water and

Wastewater Rate Report—FY 2017 at 1 [May 2016]) (mission statement).

Initially, in setting its rate schedule for 2017, the Water Board proposed instituting a 2.1% rate increase. The minutes of the Water Board's April 8, 2016 meeting expressly provide that the 2.1% rate increase was intended to fill a $76 million funding gap between anticipated revenue and expenditures projected in year 2017. Notices for the required public hearings were published. On April 25, 2016, however, the City announced its decision to forgo a remaining $122 million rental payment that the Water Board owed for that year. The City recommended that the Water Board use the additional $122 million to issue a one-time only $183 credit on customer water and sewer bills, but only to those customers who are designated class one property owners.[1] Class one property owners consist primarily of one-, two- and three-family homeowners, regardless of the location of the property, its value or size. The other customers, for whom no credit was proposed in FY 2017, consist of residential buildings with four or more units, including rental, cooperative and condominium apartments (class 2); most utility property (class 3) and commercial and industrial properties (class 4).[2]

A proposed new rate schedule was then published by the Water Board, adopting the City recommendation for a one-time $183 credit for class one property owners and linking it directly to the City's rent forbearance in 2017. Clearly the two are interrelated since the amount of the rent forbearance ($122 million) closely correlates mathematically to the total cost of the credit (664,000 x $183 = $121,500,000). Public hearings were held, and on May 20, 2016, the Water Board voted to approve the 2.1% rate increase as well as the $183 credit limited only to class one property owners.

We cannot say that as a general matter the Water Board's adoption of a rate increase and/or the implementation of a credit program distinguishing among different classes of customers is an ultra vires action. The Water Board has broad statutory authority to set water rates (*see Perry Thompson*

---

1. The City also indicated that it would forgo collection of all rental payments beyond FY 2017, up through FY 2020. The Water Board claims that the one time credit to class one property owners was for FY 2017 only and that in future years the savings would be passed on to all ratepayers.

2. The Water Board represents that of its 834,000 paying water customers, 664,000 are class one property owners. According to petitioner, in FY 2015 the City reported that class one properties included 1,091,639 residential units, whereas class two properties included 1,871,987 residential units.

*Third*, 279 AD2d at 115). We agree, however, with the trial court's assessment that the one-time credit adopted for some, but not all, water customers at the same time the Water Board needed to increase overall water rates to fund a projected budget shortfall for that particular year, has no rational basis.[3]

The Water Board typically imposes rates based upon the ratepayers' use of water. Exceptions have been made, however, for certain programs that benefit different categories of ratepayers. For instance, under the Multi-Family Conservation Program (MCP), owners of buildings with four or more dwelling units who invest in low consumption plumbing, hardware and fixtures and cooperate with the Department of Environmental Protection's (DEP) conservation efforts, are billed at a flat rate for water and wastewater services instead of at a metered rate that measures actual water consumption. The Home Water Assistance Program (HWAP) provides credits to low income, senior citizen and disabled account holders, who demonstrate an economic need for such credits. The lead and copper monitoring program offers a credit to those customers who meet certain DEP plumbing criteria and satisfy the program's requirements. The Frontage Transition Program for residential units with six or more dwelling units provides temporary financial benefits for customers transitioning from flat rate billing to metered billing. While these programs lend support for the general proposition that the Water Board has and can provide differential rates among categories of customers, it does not necessarily follow that the distinctions made in this case have a rational basis. Notably many of the programs highlighted by the Water Board serve legitimate objectives of the Water Board related to water usage or quality, such as water conservation or the servicing of vulnerable customers who demonstrate a financial need.

At bar, however, the rationale for designating class one property owners as qualified for or deserving of a credit, but not other classes of property owners, is lacking. The Water Board argues that consistent with its right to set rates "equitably," it acted rationally to alleviate the financial burden of water bills for class one property owners by issuing a credit. Such a rationale only repeats the action taken, but does not provide the underlying justification for it. There is no factual

---

3. The Court's analysis does not turn on resolution of the parties' arguments about whether the Water Board has authority to issue credits as distinct from charging differential water rates among its customers. Nor do we believe it is necessary to decide whether the credit is a tax as opposed to payment for service.

basis to conclude, as the Water Board claims, that class one property owners have been more financially burdened by paying water bills than other classes of users; there is no basis for any conclusion that class one property owners are more needy than other ratepayers. The Water Board claims that a rational basis derives from the fact that class one property owners clearly include "seniors and low or moderate income homeowners." It is equally clear, however, that class one includes owners of luxury brownstones and other high value dwellings in the City; just as it should be clear that class two properties consist of other types of residential buildings, including coops and condominiums, also occupied by seniors and persons of low or moderate income, none of which derive any benefit, directly or indirectly, from this credit. Although the Water Board claims that the credit would be more financially meaningful for class one property owners, the credit is not in any way tied to financial need. There is no rational basis for the conclusion that class one ratepayers have traditionally borne a disproportionate burden of water and sewage fees. While the Water Board argues that some members of class one rate payers experience financial hardship in paying for water, the application of the credit does not in any manner take into consideration an owner's ability to pay or customers' need for this benefit, solely relying on the classification of the property for tax purposes, which bears little relation to the stated objective.[4]

The one-time credit lacks a rational basis because it cannot be reconciled with the projected budget shortfall for the year in which the credit is given. Once the City decided to forgo its rent, the resulting credit seems to have eliminated any shortfall for the particular year.[5] The Water Board's justification for the increase as necessary to ensure funding for the costs of repairing or replacing existing portions of the City's water and sewer system, while consistent with its mission statement and statutory mandate, is irreconcilable with the Water Board's implementation of a credit if, the Water Board still needed funds to balance its books for the year. The action seems inconsistent with the Water Board's statutory mandate to make the water system self sustaining. Although the Water

---

4. The Water Board estimates that 150,000 customers benefitted by the credit are senior citizens, but concedes that there are 664,000 customers who are class one property owners. There is no information provided about the financial means and needs of these 150,000 customers.

5. The Water Board argues that even with the rent forbearance, there would still be a shortfall, necessitating a rate increase, albeit smaller than 2.1%. The mathematical basis for the Water Board's conclusion is not readily apparent from this record.

Board also argues that it can apply the forgone rental payments in the manner proposed, the Water Board's decision to use the credit as proposed instead of meeting the costs of furnishing water services does not reflect any rational basis for doing so.

The Water Board attempts to separately and independently justify the 2.1% increase by claiming that it needs the rate increase regardless of the credit because it is part of its five year projection of expenses. Yet, the Water Board's own meeting minutes confirm that the 2.1% rate increase was only to cover a $76 million budget gap for the FY 2017. Even accepting that the rate increase once adopted is permanent, the Water Board does not explain how its five year projections still have validity when they were made before the City announced its intention to forgo rent for the next five years. Moreover, even if this particular rate increase is unjustified, the Water Board's authority to determine future water rates, including any necessary increases, remains intact.

Accordingly, we find that the trial court correctly granted the petition. Concur—Friedman, J.P., Moskowitz and Gische, JJ.

Kahn, J., dissents in a memorandum as follows: Because I believe that the actions of the New York City Water Board in approving the 2.1% rate increase and one-time credit to class 1 property owners were neither ultra vires nor demonstrably arbitrary and capricious, I respectfully dissent.

At the outset, it is important to note that the rate increase and credit were approved as components of an overall rate proposal to be implemented in FY 2017 (FY 2017 Rate Proposal). Under that proposal, not only would class 1 property owners receive an immediate credit of $183 in FY 2017, but each ratepayer, including class 2, 3 and 4 property owners, would receive an average benefit of nearly $1200 over the life of the rate schedule through FY 2020.

## I. Ultra Vires

Petitioners contend that the Water Board's actions in approving the 2.1% rate increase and one-time credit were ultra vires. "[T]he Water Board is granted broad authority to set rates for water usage and is the sole entity which may do so with regard to [New York] City users[,]" however (*Matter of Village of Scarsdale v Jorling*, 91 NY2d 507, 515 [1998]; *see Perry Thompson Third Co. v City of New York*, 279 AD2d 108, 115 [1st Dept 2000]). Here, in approving the rate increase and the credit for class 1 property owners, the Water Board exercised its broad authority to "establish, fix [and] revise . . . [water] rates" (Public Authorities Law §§ 1045-g [4]; 1045-j [1]).

As the majority agrees, although there is no express statutory provision for the awarding of credits in furtherance of the Water Board's authority to fix water rates, the Water Board may do so in the exercise of its broad, inherent powers (see Perry Thompson Third, 279 AD2d at 115). Neither the language of the authorizing statutes[1] nor that of the July 1, 1985 Financing Agreement between the Water Board and the City of New York[2] limits the Water Board's authority to fix rates to the setting of amounts to be owed by ratepayers while excluding the award of credits to those ratepayers.

The Court of Appeals has long upheld the broad authority of an administrative agency, as granted by its enabling statute, to establish rates as it sees fit. In Elmwood-Utica Houses v Buffalo Sewer Auth. (65 NY2d 489 [1985]), the petitioner brought a CPLR article 78 proceeding challenging both the constitutionality of the statute that authorizes the Buffalo Sewer Authority (BSA) "to establish a schedule of rates, rentals or charges, to be called 'Sewer Rents,' to be collected from all real property served by its facilities" (Public Authorities Law § 1180) and the authority of the BSA to take into account the assessed valuation of the real property served in computing sewer rents, as that ad valorem component of the BSA's computation formula was not among the criteria expressly enumerated in the statute. The statute provided that as an alternative to basing sewer rent assessments upon certain enumerated criteria, such assessments "may be determined by the authority on any other equitable basis" (id.).

Relying on the "exceedingly strong presumption" of constitutionality accorded all legislative enactments, the Elmwood-Utica Court first held that Public Authorities Law § 1180, as interpreted and applied by the BSA, was not unconstitutional.

With regard to the method used by the BSA to fix sewer rents, the Court stated: "[T]he Legislature has conferred virtually unfettered power upon BSA to establish sewer rents, using the specific criteria enumerated in section 1180 and the general 'other equitable basis' standards. In these circumstances, it is

1. In nearly identical language, both authorizing statutes provide, in pertinent part, that the Water Board shall have the power to "establish, fix [and] revise . . . rates . . . for the use of, or services furnished [by] . . . the . . . water system" (Public Authorities Law §§ 1045-g [4]; 1045-j [1]).

2. Under the terms of the Financing Agreement, the Water Board is to "establish, fix and revise, from time to time, fees, rates, rents or other charges for the use of, or services furnished, rendered or made available by the [Water] System adequate . . . to provide for . . . payment[s and] the proper operation and maintenance of the [Water] System" (Financing Agreement § 6.1. [a]).

clear that the Legislature intended that BSA would fix sewer rents that, in its judgment, would best serve its economic and public policy goals, 'including economic differentiations among its charges so long as there is not involved any of the invidious discriminations condemned by statute or Constitution, or some utterly arbitrary discrimination not related to economic considerations or some accepted public goal' " (*Elmwood-Utica* at 497, quoting *Carey Transp. v Triborough Bridge & Tunnel Auth.*, 38 NY2d 545, 550 [1976], *cert denied* 489 US 830 [1976]). Accordingly, the Court held that "exempting tax-exempt properties from the ad valorem component [of the sewer rent computation formula] is a fair and rational application of the [Public Authorities Law § 1180] 'equitable basis' test" (*Elmwood-Utica* at 497).

Here, as in *Elmwood-Utica*, in enacting the Water Board's authorizing statutes, the Legislature likewise has conferred upon the Water Board virtually unfettered power to "establish, fix [and] revise . . . rates . . . for the use of, or services furnished [by] . . . the . . . water system" (Public Authorities Law §§ 1045-g [4]; 1045-j [1]). And, as the motion court acknowledged, there is no indication that the exercise of the Water Board's unfettered discretion in approving the FY 2017 Rate Proposal was impeded by any invidious or utterly arbitrary discrimination. Contrary to the motion court's view, however, the Water Board had the broad power to approve the FY 2017 Rate Proposal without the need for an express grant of statutory authority to do so.

Furthermore, while the governing statutory and Financing Agreement language provide that the Water Board has the authority to fix rates of payment for water usage and water-related services, the method used to fix those rates need not be directly related to water usage. Some of the water-related services cited by the Water Board during the public hearings on the instant rate changes to be funded by the resulting Water Board revenues, such as completion of the construction of City Water Tunnel number 3 at a cost of $357 million, a $1.5 billion storm water infrastructure project, and projects related to the Green Infrastructure Program at a cost of $900 million, are "bound to bear only limited direct relationship to the volume of water utilized by [a] particular consumer" (*Elmwood-Utica* at 496, quoting *Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52, 60 [1978]). And because these services "provid[e] a public benefit to the entire community, as well as an exclusive benefit to . . . individual properties," there need not be "[exact] congruence between the cost of the services provided and the rates charged to particular customers" as measured solely by water

usage (*Elmwood-Utica* at 496, quoting *Watergate II* at 59). In any event, there is no provision in either the authorizing statutes or the Financing Agreement imposing any requirement that the fixed rates be related to water usage (*see* Public Authorities Law §§ 1045-g [4]; 1045-j [1]; Financing Agreement § 6.1. [a]).

On the issue of whether rates must be gauged in proportion to physical usage of facilities or services provided by a governmental agency, *Carey Transp. v Triborough Bridge & Tunnel Auth.* (38 NY2d 545, 555 [1976]) is also instructive. In *Carey*, the plaintiff, an operator of a franchised airport omnibus line, brought a declaratory judgment action seeking a declaration that the defendant public authority's scheme of fixing bridge and tunnel tolls at a lower rate for "general purpose" bus lines, which provide general transportation services, than for "special purpose" bus lines such as that operated by the plaintiff, which provide services between fixed stations to and from the airport, discriminated against the latter (*Carey* at 548-550). The Court of Appeals rejected the plaintiff's argument that, rather than fix tolls based upon this classification of bus lines, a state authority's power to set tolls "must bear some relation" to the amount of use of that authority's physical facilities, as based on a "too restrictive" reading of the similarly broadly worded authorizing statute (*see* Public Authorities Law § 553 [12] ["The authority shall have power . . . (t)o charge tolls, fees or rentals for the use of the (bridge) project"]). The *Carey* Court explained that "[t]he [statutory] language simply means that the toll is triggered by the use, and not otherwise, and offers no basis for inferring that the toll is to be cost related to the physical use" (*Carey* at 555).

It is of no moment that *Carey* exemplifies a broad grant of statutory authority to a governmental agency to fix differing rates in the context of setting differing tolls for buses that, however similar in appearance and nature, provided differing services, without reference to the setting of a lower rate for "general purpose" bus lines as issuing a credit to them. Whether a governmental agency exercises its authority to fix differing rates for differing classes of ratepayers by declaring that one class of ratepayers should pay tolls at a lower rate, as in *Carey*, or that one class should be awarded a credit, as in this case, both actions are to similar effect, in that one class is to pay at a lower rate than another. Thus, the notion that the authority to issue credits is separate from the authority to establish rates is a fallacy.

Likewise, here, the language "for the use of, or services

furnished [by] . . . the . . . water system" in both of the governing statutes (Public Authorities Law §§ 1045-g [4]; 1045-j [1]) and the nearly identical language in the Financing Agreement (§ 6.1. [a]) simply mean that the requirement to pay for water and water-related services at a rate fixed by the Water Board is triggered by a ratepayer's participation in the City's water system. These statutory and Financing Agreement provisions neither provide any basis for inferring that the rates imposed by the Water Board must be cost-related to water usage nor impose any limitation on the Water Board's broad authority to fix rates.

Here, as in *Elmwood-Utica* and *Carey*, the Legislature's broad grant of authority to set rates empowered the agency to take the rate-setting action it employed to serve its authorized general beneficial public purposes, without the need for express legislative authorization of the means it employed to do so.

Moreover, the motion court's determination that Public Authorities Law § 1045-j (1) (vi) limits the Water Board's authority to fix rates to those applicable to projects requested by the City pursuant to the Financing Agreement, and that such authority does not include setting rates for the sole purpose of issuing credits, as that court suggests occurred here, misses the mark. The enabling statute grants the Water Board broad authority "to fix and revise . . . fees, rates . . . or other charges for the use of, or services furnished . . . by, the . . . water system . . . in such amount at least sufficient . . . to provide funds" for six enumerated purposes (Public Authorities Law § 1045-j [1]). Those enumerated purposes include, among other things, rate setting to provide funds sufficient to enable the Board to pay principal and interest on its debt obligations (Public Authorities Law § 1045-j [1] [i]); to pay the City the costs of operating and maintaining and of constructing capital improvements to the water system (Public Authorities Law § 1045-j [1] [ii]); and to pay "all other reasonable and necessary expenses of the authority and the water board in relation thereto" (Public Authorities Law § 1045-j [1] [v]); as well as the sole authorized purpose cited by the motion court, which was "to the extent requested by the city in or pursuant to the agreement, to pay or provide for such other purposes or projects as such city considers appropriate and in the public interest" (Public Authorities Law § 1045-j [1] [vi]). The enabling statute further provides that "[a]ny surplus of funds remaining in the water board after such payments have been made shall be returned to the city for deposit in the general fund" (Public Authorities Law § 1045-j [1]).

Here, the Water Board set forth among its reasons for its FY 2017 Rate Proposal its debt service obligations on $29.8 billion worth of improvements as a result of the DEP's earlier capital construction projects;[3] its continuation of its $250 per unit annual credit for qualified multi-family affordable housing under the Multi-Family Water Assistance Program; its expansion of an annual credit of $118.32 to users in the Home Water Assistance Program; the future construction of City Water Tunnel number 3; construction projects related to the Green Infrastructure Program; and an infrastructure project needed to prevent storm water from overwhelming the waste water system during heavy rainstorms, as well as the 2017 one-time credit of $183 to Class 1 users and the $1,200 credit over four years to all ratepayers. These proposals all fall within the Water Board's broad authority to fix rates as established in the previously mentioned subdivisions of Public Authorities Law § 1045-j (1). To the extent the FY 2017 one-time credit falls within subdivision (vi) of the statute, and regardless of any limitations that the Financing Agreement may have on such "other purposes or projects," it is within the Water Board's broad authority to fix rates under the other subdivisions of the statute in the manner it chooses.

Moreover, neither the motion court nor petitioners cite any support for their position that the issuance of the credit was the sole purpose of the 2.1% rate increase, and, as the record noted above reflects, the 2.1% rate increase was not proposed solely to afford a one-time credit to Class 1 ratepayers. The record evidence shows that at the public hearings, the Acting Executive Director of the Water Board provided an explanation for the 2.1% rate increase, which is that notwithstanding the rent forbearance, additional revenue was needed for capital projects such as the completion of City Water Tunnel number 3 and projects related to the Green Infrastructure Program and storm water infrastructure, and for payment of debt service. In light of the Water Board's broad authority to fix rates for various purposes, including to service outstanding debt, and their publicly stated need to raise the rates for these capital projects and other purposes, the evidence, at the very least, is insufficient to support the conclusion that the FY 2017 Rate Proposal was adopted solely to fund the credit. Thus, petitioners have not met their burden of demonstrating, by record evidence, that issuance of the credit was the sole purpose of the FY 2017 Rate Proposal.

---

**3.** These projects included mandated projects such as the Croton Water Filtration Plant, the Catskill/Delaware UV Disinfection Facility and the Newtown Creek Wastewater Treatment Plant.

Petitioners contend that the rate schedule approved by the Water Board, including the credit for class 1 property owners, is beyond its authorized powers because it would amount to nothing more than an improper tax assessed upon non-class 1 property owners if implemented. Because the revenues that would be collected by the Water Board pursuant to the FY 2017 rate schedule and credit "bear a direct relationship to the broader reality of the services and benefits actually rendered to property owners as a whole" (*Watergate II*, 46 NY2d at 61), they may not be properly regarded as taxes, "which go to the support of government without any necessity to relate them to particular benefits received by the taxpayer" (*Watergate II*, 46 NY2d at 58). Moreover, a review of the record reveals nothing indicating that the revenues that would be raised pursuant to the Water Board's approved rate schedule and credit were not derived from "reliable factual studies or statistics" or would be "exacted for [general municipal] revenue purposes" or "disproportionate to the costs associated with" the water-related services to which they would be applied, and were, therefore, a tax (*cf. New York Tel. Co. v City of Amsterdam*, 200 AD2d 315, 317, 318 [3d Dept 1994]).

Even were the differentiation among classes of ratepayers proposed by the FY 2017 Rate Proposal to amount to a tax classification, in order for such a classification not to be sustained, it must be "so purely arbitrary as to have no reason, not even an insufficient or merely plausible reason, to justify it" (*Carey* at 552, quoting *Matter of Keeney*, 194 NY 281, 286 [1909], *affd* 222 US 525 [1912] [internal quotation marks omitted]). Here, the Water Board's classification scheme does have a rational basis, however, as it reflects the principle that owners "may properly be considered less able to pay for a [water] system, especially insofar as the system redounds to the common benefit of all property rather than to one specific parcel" (*Elmwood-Utica* at 497). Because the FY 2017 Rate Proposal was put forth in order to provide additional funding for a number of specific, publicly stated purposes, this is not a case where a governmental entity is assessing a fee for revenue purposes to fund a "general governmental function" that benefits everyone while imposing the fee burden on a discrete group of residents, thereby assessing an unauthorized tax (*cf. Matter of Phillips v Town of Clifton Park Water Auth.*, 286 AD2d 834 [3d Dept 2001], *lv denied* 97 NY2d 613 [2002]). Moreover, there is no case law that clearly prohibits the Water Board from adopting a rate increase and charging marginally differential rates or issuing credits to a particular class, at least where, as here, all users are charged for the water

system's maintenance and construction, and as long it also can be found that the different charges are based on rational policy considerations, as is the case here (*see* II, *infra*).

For the foregoing reasons, I believe that the Water Board's actions in approving the FY 2017 Rate Proposal were not ultra vires.

## II. Arbitrary and Capricious

With regard to whether the Water Board's actions in approving its FY 2017 Rate Proposal had a rational basis and were, therefore, not arbitrary and capricious, a governmental agency's interpretation of its own plan or regulation must be accorded deference on judicial review "to determine whether there is a rational basis for the decision and, if so, the agency's conclusion must be upheld" (*Matter of Entergy Nuclear Operations, Inc. v New York State Dept. of State*, 28 NY3d 279, 284 [2016] [internal brackets and citation omitted]). The Court of Appeals has further explained: "An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts[.] If the court finds that the determination is supported by a rational basis, it must sustain the determination even if the court concludes that it would have reached a different result than the one reached by the agency[.] Further, courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise" (*Matter of Peckham v Calogero*, 12 NY3d 424, 431 [2009] [citations omitted]).

An agency's determination is rational as long as it is not "so purely arbitrary as to have no reason, not even an insufficient or merely plausible reason, to justify it" (*Carey* at 552). A petitioner challenging an administrative action carries the "heavy burden" of showing that the action was both unreasonable and unsupported by the evidence (*Matter of Big Apple Food Vendors' Assn. v Street Vendor Review Panel*, 90 NY2d 402, 408 [1997]).

## A. One-time Credit

Petitioners contend that the Water Board's approval of the credit lacked any rational basis. The record does not support petitioners' contention in this regard, however. Rather, the record reflects that the credit was approved for the purpose of providing expedited financial relief to class 1 property owners, including financially overburdened lower and middle-class homeowners, many of whom are seniors, who had been disproportionately and adversely affected by the rise in water rates in recent years.

More importantly, it is the petitioners who have the "heavy burden" of showing that the Water Board's determination was both unreasonable and unsupported by the evidence (*Big Apple Food*, 90 NY2d at 408). In order to meet that burden, petitioners must come forward with prima facie evidence that the Water Board's determination was so purely arbitrary as to have no reason, not even an insufficient reason, to justify it (*Carey* at 552). Here, petitioners have not met their heavy burden of making a prima facie showing that the Water Board's determination was purely arbitrary and without any reason, however insufficient, or support in the record.

In this regard, the reliance of both the motion court and the petitioners on *Elmwood-Utica* and *Watergate II* is misplaced. In *Elmwood-Utica*, the Court of Appeals found that the petitioners in an article 78 proceeding failed to carry their burden of making a prima facie showing that the public authority's method of calculating sewer rents was without rational basis (*see Elmwood-Utica* at 495, 498). In *Watergate II*, a declaratory judgment action, the Court of Appeals rejected the plaintiff's challenge to the public authority's consideration of assessed valuation imposition of sewer rents, albeit without express reference to which party had the burden of proof (*see Watergate II* at 61). Both the motion court and petitioners have misinterpreted these cases as supportive of placement of the burden of proof in an article 78 proceeding on a governmental agency (in this case, the Water Board) rather than on the challengers of the agency's action (in this case, petitioners).

Petitioners also maintain that the Water Board's approval of the credit lacks a rational basis because the credit is not directly related to water usage or provision of water-related services. As is the case with the overall fixing of a rate schedule, the awarding of a credit need not have any bearing on water conservation or water usage, provided, however, that the Water Board's decision to do so was reasonable. The Water Board, like the public authorities in *Elmwood-Utica* and *Carey*, may exercise unfettered discretion to fix rates, including credit adjustments of those rates, so long as the determination of those rates does not involve invidious illicit discriminations and the determination is not utterly arbitrary and unsupported by any economic and public policy goals (*Elmwood-Utica* at 497, quoting *Carey* at 553). Here, the Water Board's approval of the credit furthers the economic and public policy goal of providing financial relief to the low and middle-income homeowners comprising many, if not most, of the class 1 property owners. Moreover, the Water Board's approval of the

credit is consistent with the Board's mission to "proactively consider[ ] the optimal level [of rates] . . . and sustainable provision of high-quality service at a fair price for our customers" (New York City Water Board, New York City Water and Wastewater Rate Report—FY 2017 at 1 [May 2016]).

Furthermore, the Water Board's approval of the credit in this case is consistent with its previous awarding of credits to certain categories of ratepayers in need of financial relief. For example, the Water Board's Home Water Assistance Program (HWAP) was established to award credits to financially disadvantaged low income homeowners, senior citizens and the physically challenged. The Water Board's awarding of credits under that program, as well as its approval of the credit at issue in this case, is also consistent with the principle that a governmental agency may provide exemptions or credits to some property owners who are less able to pay for the water and sewer system, especially as such a system "redounds to the common benefit of all property rather than to one specific parcel" (*Elmwood-Utica* at 497). Thus, it is not "irrational to exempt [those property owners who are less able to pay] from those charges designed to defray the costs of the public benefit services supplied by [the water and sewer] system" (*id.* at 497-498; *see Carey* at 553). Moreover, recent Water Board programs, such as the Frontage Transition Program and the Multi-family Conservation Program (MCP) provided credits to non-class 1 property owners but not to class 1 property owners, and the credit approved by the Water Board here helps to reduce the disproportionate burden of payment on class 1 property owners.

Additionally, the record includes the explanation offered by the Acting Executive Director of the Water Board that the credits and accompanying 2.1% rate increase were approved as part of an overall plan to generate revenue to be applied toward such capital projects as City Water Tunnel number 3, the Green Infrastructure Program and storm water infrastructure projects, and to offset the City water system's debt service. This explanation, in itself, provides a sufficient reason for finding that the Water Board had a rational basis for approving the credit (*see Elmwood-Utica* at 496 [observing that public authority may use "formulae more sophisticated" than consumer water consumption in preparing to fund such projects as "construction and maintenance of . . . sewer lines, sewage collection and treatment facilities"]).

In any event, the credit approved by the Water Board in this case is water-related, in that the credit was approved as a

component of an overall proposal to fixing the rates at which revenue will be generated from various classes of ratepayers for the purpose of funding the City's water system. And the Water Board's action in approving the credit relates to water usage for the additional reason that the credit would reduce the disproportionate share of the burden of payment of water bills that has been placed on class 1 property owners in recent years, largely due to recent Water Board programs, such as the Frontage Transition Program and the MCP, that provide credits only to ratepayers other than class 1 property owners.

Petitioners also contend that the Water Board's approval of the credit was without rational basis because it was done in response to a proposal put forward or supported by elected officials. To the extent that the Water Board made its determination to issue the credit for this reason, it was statutorily authorized to do so, as an administrative agency may "take into consideration the views and policies of any elected official or body" in making its determinations (see Public Authorities Law § 2824 [1] [g]). Moreover, the record reflects that a number of New York state and city officials, in expressing their support for the proposal, acknowledged the disproportionate and adverse effect of the rise in water rates on lower and middle-class homeowners, including many seniors, in recent years.

Neither was the Water Board's approval of the credit as proposed irrational because of the lack of inclusion in the credit proposal of any requirement, such as that in the HWAP, that each class 1 property owner demonstrate financial need in order to be entitled to the credit. To impose such a requirement upon approximately 664,000 class 1 property owners would entail cumbersome application procedures, substantial processing delays, and additional administrative expenses that would likely result in a further increase in rates.

B. Rate Increase

Petitioners also contend that the Water Board approved the 2.1% rate increase without a rational basis for doing so. The Water Board's determination to approve the rate schedule could be successfully challenged as arbitrary and capricious only if it lacked a rational basis, i.e., was "without sound basis in reason or regard to the facts" (*Matter of Peckham v Calogero*, 12 NY3d at 431). If "there is a rational basis for the decision[,]" however, "the agency's conclusion must be upheld" (*Entergy* at 284 [internal brackets omitted]).

Again, petitioners' contention in this regard lacks support in the record. Rather, the record reflects that under the Water Board's approved rate schedule, not only would class 1 property owners receive an immediate credit of $183 in FY 2017, but each ratepayer, including class 2, 3 and 4 property owners,

would receive an average benefit of nearly $1,200 over the life of the rate schedule through FY 2020.

Furthermore, the record includes the explanation of the Water Board's Acting Executive Director that the 2.1% increase would represent an increase in the base rates not only in FY 2017, but over the course of four fiscal years to FY 2020, during which the consumption of City water is expected to further decline, as it has in recent years. In the absence of a rate increase, this decline would result in a reduction of needed revenues. Specifically, in FY 2017, revenue in the amount of $3.548 billion was needed not only to fund water provision in general, but also to pay for ongoing water-related capital projects, including a City Water Tunnel number 3, $1.5 billion storm water infrastructure project, and $900 million in projects related to the Green Infrastructure Program, as well as to cover debt service costs. As of May 11, 2016, the total revenue collected by the Water Board in FY 2016 was expected to be $3.7 billion. It was believed that, with the anticipated reduction in water consumption plus the inauguration of credit programs for owners of affordable housing and low income homeowners, without a rate increase, the projected revenue for FY 2017 would be $3.475 billion. Thus, because of the anticipated need for $3.548 billion in revenue in FY 2017, a 2.1% rate increase in FY 2017 was required in order to generate $73 million in additional revenue. Apparently, because the revenue to be generated by the Water Board upon implementation of the rate increase would be applied entirely to a combination of water system operations and maintenance, water-related projects and services, and debt service, there would be no surplus of revenues to be returned by the Water Board to the City's general fund in accordance with the statutory requirement (Public Authorities Law § 1045-j [1] [vi]).

The record also contains the Water Board's Acting Executive Director's statement that if the $183 credit were eliminated, the 2.1% rate increase would merely drop to a 1.9% increase in FY 2017. Although a statement appears in the minutes of the April 8, 2016 Water Board meeting, prior to the City's rental forbearance announcement, to the effect that a 2.1% rate increase would fill a $76 million budget gap, petitioners have failed to show that resolving that or any budgetary shortfall occasioned by the issuance of the one-time FY 2017 credit was the Water Board's sole reason for approving the rate increase.

Moreover, the distinctions among classes of taxpayers or ratepayers need not be "exact or perfectly defined" in order for the classification to be sustained by a reviewing court (*see*

*Carey*, 38 NY2d at 552). Here, petitioners argue that the proposed classification should be disallowed because wealthy townhouse property owners or landlords of one-to-three unit rental properties would be entitled to receive a $183 credit for each class 1 property they own. This argument merely refers to anomalies in the classification system and ignores the fact that the class of the property owners who would receive the $183 credit consists primarily of overburdened lower and middle class homeowners, many of whom are senior citizens. The Water Board chose simply to approve the awarding of the credit to the already established tax classification of class 1 property owners, which largely consists of the lower and middle-class homeowners whom the credit was intended to benefit. These class 1 property owners, like the tax exempt governmental, charitable and religious organization property owners in *Elmwood-Utica*, "may properly be considered less able to pay for a [water] system," and therefore entitled to the credit (*Elmwood-Utica* at 497). Thus, petitioners have not demonstrated that the tax classification proposed by the Water Board, to the extent that it may be regarded as such, is entirely without reason and should not be sustained (*see Carey*, 38 NY2d at 553).

Furthermore, petitioners have failed to establish that their water charges would be disproportionate to the services that they would receive under the FY 2017 rate schedule approved by the Water Board. Because non-class 1 property owners account for approximately 20% of the City's water system ratepayers while class 1 property owners account for 80% of ratepayers, the average non-class 1 property owner would be paying an increase covering a $183 credit for each of four class 1 property owners, or a total of $732. This amount would be more than compensated for by the average benefit of $1,200 each ratepayer would receive over the life of the rate schedule through FY 2020. Thus, under the FY 2017 Rate Proposal, the difference in treatment between class 1 and non-class 1 ratepayers would be de minimis.

In reviewing the Water Board's determination, this Court must defer to the Water Board's rational interpretation of its own resolutions in its area of expertise (*see Peckham* at 431). In this case, I believe that petitioners have not met their heavy burden of showing that the Water Board's actions in adopting the resolutions were irrational and unsupported by the evidence (*Big Apple Food*, 90 NY2d at 408).

Accordingly, I would reverse the order of Supreme Court, deny the article 78 petition and dismiss the proceeding.