================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 130
In the Matter of Prometheus
Realty Corp., et al.,
            Respondents,
        v.
New York City Water Board, et
al.,
            Appellants.

            Melanie T. West, for appellants.
            Michael Berengarten, for respondents.
            Natural Resources Defense Council et al., amici curiae.

FAHEY, J.:

        The New York City Water Board collects revenues to keep

the City's water and sewer systems financially self-sustaining.

Since the early 1990s, to serve the goal of water conservation,

the Water Board has been ushering in a transition from flat-rate

fees based on property frontage to a metered rate proportional to

- 1 -

actual water usage.  To provide relief from increased charges to the owners of larger residential buildings, the Board soon introduced a temporary Frontage Transition Program, whereby owners of buildings containing six or more units were permitted to continue frontage-based billing.  In addition, some owners of buildings containing four or more units have benefitted from a Multi-Family Conservation Program, which set a fixed annual rate in return for owner investment in low-consumption plumbing fixtures and the like.  Owners of smaller residential buildings than these did not enjoy similar benefits related to the transition to metered billing.

The Water Board leases the infrastructure of the water supply and wastewater systems from the City, pursuant to an agreement providing that rental payments are required "only to the extent requested by the city in each Fiscal Year." Historically, the rent was tied to what the City owed on its water- and sewer-related general obligation bonds, but in 2003 the metric whereby the rent was calculated was changed pursuant to the lease, and in time the rent began to exceed the City's debts on these general obligation bonds.  The increased payments to the City coincided with a period of regular annual increases in water rates, including double-digit increases from 2007 to 2011.  The City and the Board received complaints from ratepayers that the City was enjoying a windfall.

In early April 2016, the Water Board and the New York

City Department of Environmental Protection (DEP), which acts as administrator and billing agent for the Board, published a rate proposal notice for Fiscal Year 2017, with a rate increase of 2.1%, to fund a $76 million gap between projected needs and revenues.  The Water Board and DEP also proposed the extension of a Home Water Assistance Program for low-income, senior, and disabled homeowners; the establishment of a new Multi-family Water Assistance Program for owners of affordable housing, providing a per-unit credit not to exceed $250; and a rate freeze for account-holders using less than 95 gallons of water per day.

At a press conference on April 25, 2016, the Mayor of the City of New York announced that the City would forbear collecting rents from the Water Board through Fiscal Year 2020, resulting in a saving of $122 million in Fiscal Year 2017.  At the same time, the Mayor proposed that the Board issue a one-time bill credit of $183 for the fiscal year to all account holders that owned properties identified by the City as belonging to Tax Class 1, a category to which almost 80% of the Water Board's account holders belong.  The New York City Department of Finance defines a Tax Class 1 property as "[m]ost residential property of up to three units (family homes and small stores or offices with one or two apartments attached), and most condominiums that are not more than three stories."  The Mayor further proposed that in Fiscal Years 2018-2020 the savings from the rent forbearance would be passed on to all account holders.

The Water Board accepted the Mayor's proposal and issued a revised notice for Fiscal Year 2017.  On May 20, 2016, following public hearings, the Board adopted a resolution approving both the 2.1% rate increase and the bill credit, as well as the assistance programs and low-consumption rate freeze. The Board published a rate schedule effective July 1, 2016.

Petitioners -- various landlords not eligible for the bill credit and a landlords' not-for-profit association -- commenced this CPLR article 78 proceeding against the Water Board and DEP, challenging the resolution and rate schedule.  They assert that the Water Board's determinations were irrational, arbitrary and capricious, and exceeded the Board's authority.

In reply, respondents submitted an affidavit of Steven W. Lawitts, Acting Commissioner of DEP and Acting Executive Director of the Water Board, explaining the rationale for the bill credit and simultaneous rate increase.  The $183 credit "was directed to class 1 properties in a manner similar to already established programs for multi-unit apartments, seniors, and low-income households."  Lawitts added that elimination of the one-time credit would not obviate the need for a significant rate increase, because the Board, by long-standing practice, sets water rates to maintain rate stability over at least a five-year forecast, as is standard in the public water supply industry.  He stated that even if the bill credit were eliminated and the rental forbearance dedicated to across-the-board rate mitigation,

there would only be "a relatively small reduction" in the rate increase, from 2.1% to 1.9% in Fiscal Year 2017.  Petitioners did not offer expert proof challenging the affidavit.

Supreme Court granted the petition on the basis that increasing the rates while simultaneously giving a bill credit "amounts to an impermissible tax" (54 Misc 3d 745, 751 [Sup Ct, NY County 2016]).  The court held that the resolution and rate schedule were "ultra vires and exceeded the Water Board's statutory authority" (id. at 762, citing CPLR 7803 [2]) and "unreasonable, arbitrary, capricious and an abuse of discretion" (id., citing CPLR 7803 [3]); vacated the resolution and rate schedule; enjoined respondents from implementing the rate increase or bill credit; and ordered that the Fiscal Year 2016 water and wastewater rate schedule remain in effect until further action by respondents.

The Appellate Division, with one Justice dissenting, affirmed Supreme Court's judgment (147 AD3d 519 [1st Dept 2017]).  The court rejected the claim that the Water Board's action was ultra vires, but upheld the lower court on the ground that there was no rational basis for adopting the one-time credit at the same time as a water rate increase (see id. at 521-22).  The Appellate Division reasoned that Tax Class 1 owners were not "more needy than other ratepayers," and that the one-time credit "does not in any manner take into consideration an owner's ability to pay or customers' need for this benefit, solely

relying on the classification of the property for tax purposes" (id. at 523). The Appellate Division further stated that the credit lacked a rational basis because it could not be reconciled with the projected budget shortfall for the year in which the credit was given (see id.).

The dissent focused on the standard of review, noting petitioners' "heavy burden of making a prima facie showing that the Water Board's determination was purely arbitrary and without any reason, however insufficient, or support in the record" (id. at 532 [Kahn, J., dissenting]). The dissenting Justice would have held that "the Water Board's approval of the credit furthers the economic and public policy goal of providing financial relief to the low and middle-income homeowners comprising many, if not most, of the class 1 property owners," by "reduc[ing] the disproportionate share of the burden of payment of water bills that has been placed on class 1 property owners in recent years, largely due to recent Water Board programs . . . that provide credits only to ratepayers other than class 1 property owners" (id. at 532-534).

The Appellate Division granted respondents leave to appeal, certifying the question whether its order was properly made. Following a mootness inquiry, we retained jurisdiction over the appeal.[1] We now reverse.

_____

[1] Respondents assured us that, pending appeal, they would not take any action to supersede the Fiscal Year 2016 rate schedule. Our adjudication of the merits will result in

Our case law holds that a utility has "unfettered discretion to fix [rates] as it will so long as invidious illicit discriminations are not practiced and differentials are <u>not utterly arbitrary and unsupported by economic or public policy goals, as it reasonably conceives them</u>" (<u>Carey Transp. v Triborough Bridge & Tunnel Auth.</u>, 38 NY2d 545, 553 [1976] [emphasis added]).  A petitioner's task in demonstrating that the rate-setting agency's determination is unreasonable is appropriately described as a "heavy burden" (<u>see</u> <u>generally</u> <u>Matter of Nazareth Home of the Franciscan Sisters v Novello</u>, 7 NY3d 538, 544 [2006]; <u>Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health</u>, 85 NY2d 326, 331 [1995]).

It is clear from the governing statutes that water and sewer rates may be determined in accordance with public policy goals, and not only economic goals.  The Water Board "may take into consideration the views and policies of any elected official or body, or other person" and ultimately "appl[ies] independent judgment in the best interest of the authority, its mission and the public" (Public Authorities Law § 2824 [1] [g]).  Moreover, the statutory scheme gives the Board leeway to charge more than the bare minimum necessary for revenue recovery, by stating that the rates are to generate "revenues which, together with other revenues available to the board, if any, shall be <u>at least</u> sufficient at all times so that such system or systems shall be

immediate and practical consequences to the parties.

placed on a self-sustaining basis" (Public Authorities Law
§ 1045-g [4] [emphasis added]).  In short, New York City's "Water
Board is granted broad authority to set rates for water usage"
(Matter of Village of Scarsdale v Jorling, 91 NY2d 507, 515
[1998]).

Here, we cannot say that respondents' actions were
"utterly arbitrary and unsupported by economic or public policy
goals, as it reasonably conceives them" (Carey Transp., 38 NY2d
at 553).  Notably, Tax Class 1 owners as a class had been
excluded for years from rate relief programs such as the Frontage
Transition Program, and had enjoyed other benefits only if
individually eligible based on income or usage.  The decision to
allocate the relatively modest gain from the rent forbearance so
as to be meaningful to this very large category of ratepayer,
without requiring a complex eligibility and application process
that would entail administrative costs, was not irrational.  The
pre-existing Tax Class classifications, singling out
single-family households and owners of small apartment buildings,
served this purpose.

Nor would respondents have been wholly irrational to
conclude that a division among all account holders, yielding a
smaller one-time credit, would have had a negligible impact for
owners of large apartment buildings and may not have been passed
on to tenants.  Moreover, contrary to the Appellate Division's
intimation, there was no burden on respondents to show that the

beneficiaries of the one-time credit were, in terms of their personal finances, "more needy" in comparison with other landowners (147 AD3d at 523).

In short, the distinction between beneficiaries and others did not have to be drawn with surgical precision (see generally Carey Transp., 38 NY2d at 554; Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489, 495 [1985]), and must be upheld in the absence of invidious discriminations or a differential that is entirely unsupported by rational goals.

A separate question is whether the rate increase was justified, given the rental forbearance. Petitioners contend that by using the $122 million in rental forgiveness to dispense the same amount in credits, respondents recreated the funding gap it had identified in the original budget. This argument is undermined by Lawitts's affidavit. He states that elimination of the one-time credit would not remove the need for the rate increase, because the Water Board sets water rates to maintain revenue stability over at least a five-year forecast. The decision to preserve the original planned rate increase was not entirely irrational. This is particularly true in light of the fact that the Board would have kept the rate increase at around 2% per year. The Board is not obliged to set the lowest possible rate every year; it can balance rate-setting with other needs and goals. Applying the well-established deferential standard of review, we conclude that respondents' actions fell short of being

utterly arbitrary and unsupported by rational goals.

Finally, we agree with the Appellate Division in one significant respect: respondents did not act ultra vires or levy a tax.  As respondents point out, "any rate variance can be framed as a decrease in some ratepayers' charges at the expense of other ratepayers," but such a disparity does not amount to impermissible taxation where, as here, the rate increase was tied to a utility's forecast of the cost of furnishing a service (see generally Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 58-59 [1978]).

Accordingly, the order of the Appellate Division should be reversed, with costs, the petition dismissed, and the certified question not answered as unnecessary.

In the Matter of Prometheus Realty Corp. et al.
v New York City Water Board et al.

No. 130

RIVERA, J.(dissenting):

We are called upon to consider the propriety of a New York City Water Board (Board) decision granting a water bill credit to one service class while simultaneously imposing a system-wide rate increase affecting all users. As a general matter, the Board has authority to issue credits, as well as to increase water bill rates, as it deems necessary and proper to further its statutorily-defined economic and public policy goals. The Board's decisions, however, must be based on the exercise of independent judgment, and are subject to meaningful judicial review to ensure that they are not unreasonable, unsupported by evidence, or arbitrary and capricious. Our review is narrow, but we abdicate our role as the final check on administrative process if we merely rubberstamp the Board's decisions. I disagree with the majority that the Board's action here survives our scrutiny, because there is no evidence before us that the Board acted rationally in approving the credits and rate increase.

The Board is an independent public entity with broad responsibility for regulating the provision of water to New York City residents. It is organized under our state's Public

- 1 -

Authorities Law as a public benefit corporation,[1] charged with acting "for the benefit of the people of the city and the state, [and] for the improvement of their health, welfare and prosperity" (Public Authorities Law §§ 1045-f [9], 1046).  It is composed of seven members, appointed by the mayor, at least one of whom must have "experience in the science of water resource development" (id. § 1045-f [2]).  The Board's independence is assured by for-cause removal protection for its members, who serve defined two-years terms, are bound by various conflict-of-interest provisions, and enjoy statutorily-guaranteed reimbursement for expenses incurred in the performance of their duties (id. §§ 1045-f [2]-[5]).

The Board helps ensure residents of New York City have continuous and plentiful access to clean water.  It works in partnership with the City of New York and the New York City Municipal Water Finance Authority to finance and construct water projects (id. § 1045-i [1]), and it retains exclusive authority to set rates for the use of New York City's water and sewerage system (id. §§ 1045-f [1], 1045-j [9]; see also Matter of Village of Scardsale v Jorling, 91 NY2d 507, 515 [1998] ["the Water Board . . . is the sole entity which may (set water rates) with regard

_____

[1] According to its enabling statute, the Board is "a body corporate and politic, constituting a corporate municipal instrumentality of the state" (Public Authorities Law § 1045-f [1]).  This unusual phrase seems to appear only in the public utility context, and does not serve to distinguish the Board from other public authorities.

to City users"]).

        Although the Board has "broad authority to set rates
for water usage" (Matter of Village of Scarsdale, 91 NY2d at
515), it must exercise informed judgment in doing so.  Thus, its
actions are cabined by its legislatively-defined public health
mission, as well as notice and comment requirements that
encourage public participation in the rate-setting process.
Public Authorities Law § 1045-f sets forth specific, detailed
procedures and limitations to which the Board must adhere as it
sets New York City water rates.  The rate schedule must be "at
least sufficient at all times so as to provide funds in an amount
sufficient together with other revenues available to the board"
to cover the Board's many expenses, which include servicing the
water system's debt, paying the City for maintaining and
administering the water system, making capital improvements to
the water system, accumulating needed financial reserves, and
meeting responsibilities under any agreements the Board may enter
into (Public Authorities Law § 1045-f [1]; see also Matter of
Village of Scardsale, 91 NY2d at 514-515; Giuliani v Hevesi, 90
NY2d 27, 34 [1997] ["The Board's main function is to provide
sufficient funds -- through fixing and collecting water and sewer
charges and other revenues -- for the City to operate and
maintain the Water System and for the Authority to service water
and sewer debt"]).  Before setting rates, the Board must hold
public hearings, noticed according to statute, in every borough

of New York City (Public Authorities Law §§ 1045-j [3], [9-a]).
All affected users wishing to testify must be heard (id. § 1045-j
[3]).  The Board's subsequent determination must be made in
writing, made available for public inspection, and widely
publicized before new rates may go into effect (id.).

We review the Board's rate-setting under the standard
applicable to all public benefit corporation rate-setting
activities.  As a general matter, "in the operation of its
facilities[, a rate-setting entity] may fix tolls and charges
which in its judgment will best serve its economic goals and
public policy goals" (Carey Transp. v Triborough Bridge & Tunnel
Auth., 38 NY2d 545, 550 [1976]).  This can include treating
different categories of users differently -- so-called "economic
differentiation" -- so long as the classification adopted does
"not involve[] any of the invidious discriminations condemned by
statute or Constitution, or some utterly arbitrary discrimination
not related to economic considerations or some accepted public
goal" (id.).  Rates need not be determined with "mathematical
nicety" and will not be set aside simply "because in practice
[they] result[] in some inequality" (Elmwood-Utica Houses v
Buffalo Sewer Auth., 65 NY2d 489, 495 [1985] [internal quotation
marks omitted]).

All rates and rate classifications must nevertheless
pass rational basis review (see Murphy v New York State Div. of
Housing and Community Renewal, 21 NY3d 649, 652 [2013]; Elmwood-

Utica Houses, 65 NY2d at 495-496; see also Carey Transp., 38 NY2d at 556 [subjecting the Triborough Bridge and Tunnel Authority's rate classifications to rational basis review]).  It is, admittedly, a "heavy burden" to show that a rate-setting methodology "is unreasonable and unsupported by any evidence" (Matter of Nazareth Home of the Franciscan Sisters v Novello, 7 NY3d 538, 544 [2006]).  Still, courts must assess public authority rate determinations to ensure that they are not arbitrary or capricious.  In reviewing an authority's rate schedule, then, courts must scrutinize authority action to make certain that it complies with all applicable statutes, does not violate any protections imposed by statute or the Constitution, and has a rational basis (Carey Transp., 38 NY2d at 550; Elmwood-Utica Houses, 65 NY2d at 495).  It is axiomatic that an agency cannot have acted rationally if it fails to engage in a reasoned assessment of the facts and issues before pronouncing judgment.

The record of events in this case establishes that the Board's decision to issue a one-time $183 credit to class one property owners while simultaneously imposing a 2.1% rate increase is not a result of the exercise of independent judgment and was therefore irrational.  The credit, payable only to owners of one, two, and three family homes, re-created a budgetary shortfall that had been more than eliminated by the City's forbearance of $122 million in Board-owed rental payments.  The Board nevertheless kept its proposed 2.1% rate increase for

Fiscal Year 2017, but changed its justification, claiming that
the rate increase was necessary to close the gap the Board itself
created with its credit.  As the administrative procedural
history of the Board's decision illustrates, this new rate
schedule, to the extent it provided for the credit and rate
increase, lacked a rational basis as required by law.

In the recent past, the Board has imposed relatively
high rate-increases, including a 14.5% increase in 2009.  In
accordance with Public Authorities Law § 1045-f (1), the revenue
generated by these rates has been used to pay for maintenance,
debt service on capital projects and improvements, and, pursuant
to an agreement with the City of New York, annual lease payments
to New York City for rental of the City's water system.  The
rate-setting process for Fiscal Year 2017 began with an April 8,
2017 Board meeting, at which the Board's members discussed a 2.1%
rate increase, along with four specific proposals to extend and
expand Board programs to provide rate relief and encourage water
conservation among particular categories of users.[2]  That same
day, the Board issued public notice that its new rates and

_____

[2] The four class-based programs considered at the April 8
meeting included: (1) "[a] freeze of the minimum charge for
meter-billed customers"; (2) "[a]n increase in the annual credit
. . . and an expansion of program eligibility to include
additional senior property owners" for the "Home Water Assistance
Program"; (3) "a credit not to exceed $250 per unit for qualified
multi-family affordable housing properties"; and (4) "an
extension of the grace period for [properties that were
automatically enrolled in the Multi-family Conservation Program]
. . . and a change in the charge for non-compliance."

program changes would go into effect on July 1, 2016, and laid out a schedule of public hearings at which they would be discussed. The minutes from the April 8 Board meeting conclusively establish that the 2.1% rate increase was necessary to "fill the [projected] $76 million funding gap" for the upcoming year. Those projections included a $122 million rental payment to the City.

Approximately two weeks later, on April 25, 2016, the Mayor of the City of New York, acting within authority conferred on him by the agreement between the Board and the City for the lease of the water system, announced that he would not request any of the $244 million rental payment due under the lease and that this forbearance would apply through Fiscal Year 2020.[3] In the same speech, the Mayor proposed that the uncollected rental payments go directly to a one-time $183 credit on water and sewer bills for each of the approximately 664,000 account-holders in class one -- one, two, and three family homeowners. As the Mayor saw it, "[f]or decades the City has been using the water bill as a cash cow for the general treasury," which, he believed was "not right." This credit was intended "to give something back to so many hardworking homeowners all over this city who deserve a break."

Two days after the Mayor's announcement, on April 27,

---

[3] The Mayor had announced earlier that, in Fiscal Year 2017, the City only planned to seek 50% of the rent it was owed.

2016, the Board issued a new notice for public hearings on its Fiscal Year 2017 rate schedule. This new announcement included the same 2.1% rate-hike proposed and discussed at the April 8 meeting, and was otherwise identical to the prior rate schedule notice, with a single exception. Without explanation, the new notice included a new Board project: an added proposal for "[a] bill credit based on the F[iscal] Y[ear] 2017 elimination of the rental payment." On May 20, 2016, over objections from various elected officials and certain users, the Board adopted the new rate schedule as proposed, including the "one-time bill-credit of $183 based on the elimination of the F[iscal] Y[ear] 2017 rental payment for each water and sewer account identified by [the Department of Finance] as a Tax Class 1 property."

Even under the most charitable reading of this chronology, only one conclusion is possible: the Board failed to adhere to its statutory requirements and did not engage in an independent assessment of the potential impact of the rent-forbearance on the Board's legislatively-mandated economic and public policy goals. Yet that is exactly what the Board must do. Of course, the Board has broad authority to set rates that will cover debt service and ensure that the water system is self-sustaining (see Public Authorities Law §§ 1045-j [1], 1045-g [4]). This requires that the Board consider costs, liabilities, future project expenses, and payment burdens on financially vulnerable service users, as well as prospective revenues.

However, there is no record support here that the Board did any of these types of analyses.  The Board's two-day turnaround on the second notice of its proposed rate schedule and its immediate adoption of the Mayor's proposed credit -- down to the exact dollar, without any suggestion of a Board plan for how to capitalize on the City's announced multi-year forbearance -- shows no evidence that the Board gave this proposal the consideration that rate-setting requires, particularly where there is nothing to suggest that the Board had previously considered whether to provide class-one homeowners with specific relief distinct from that provided to other classes of users. Such action does not entitle the Board's rate-setting decision to judicial deference, because the Board did not "apply . . . judgmental considerations based upon the expertise and experience of the agency" (Matter of Catholic Med. Ctr. of Brooklyn & Queens v Department of Health of State of N.Y., 48 NY2d 967, 968-969 [1979]; see also Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health, 85 NY2d 326, 331 [1995] ["An administrative agency's exercise of its rule-making powers is accorded a high degree of judicial deference, especially when the agency acts in the area of its particular expertise"]; see generally 23 Carmody-Wait 2d § 145:35 [noting that New York courts defer to agency determinations that fall within the agency's area of expertise]).

The City argues that the Board was entitled to take the

Mayor's proposal into account in reaching its rate-setting determination.  Assuming the City and majority are correct that Public Authorities Law § 2824 (1) (g) entitles Board members to "take into consideration the views and policies of any elected official or body" (majority op at 7), the same statutory provision requires that Board members "ultimately apply independent judgment in the best interest of the authority, its mission and the public."  There is simply no record support for the proposition that the Board did so here.

The Mayor's forbearance of rental payments through 2020 to address what he identified as an unfair burden caused by the City's demand for rental payments directed to the general treasury, rather than solely to the City's water needs, is a laudable goal.  It is not, however, the Board's prerogative to cure what the City perceives as inequities in the manner proposed by the Mayor unless the Board engages in its own considered assessment that leads it to conclude that, in furtherance of its own statutory mandate and goals, it should grant a credit of its own volition, in the same amount, to the same class of users.

As it has in the past, the Board acts within its authority and mission by setting rates and adopting programs that promote conservation, encourage modernization of the water system, and promote equity by providing financial relief to seniors and low-income customers (see Public Authorities Law §§ 1045-j [1], 1045-g; James Bonbright, Principles of Public Utility

Rates, Chapter 8: Social Principles of Ratemaking [2d 1998];
Brief of Amici Curae Natural Resources Defense Council and the
Public Utility Law Project of New York, Inc. at 19). Here, the
Board provided no rational basis for how the credit fits within
these goals, as it provided no analysis about how it reached the
same conclusion as the Mayor -- i.e. that a $183 credit to a
class of homeowners addressed a historically-unfair burden.

An agency's departure from a settled course of behavior
may suggest the absence of informed reasoning or arbitrary
decisionmaking (see Motor Vehicle Mfrs Ass'n of U.S. Inc., v
State Farm Mut. Auto. Ins. Co., 463 US 29, 41-42 [1983]).
Critically, the credit departs from the Board's prior programs of
economic differentiation. Those rate-differentials and special
programs had distinguished between users on the basis of
financial need, as measured by specific defined criteria, or in
the interest of implementing programs encouraging user behavior
that furthered the Board's long-term conservation and
modernization goals. Here, the Board did not even attempt to fit
the credit into this framework.

The Board's additional explanations for the 2.1%
increase are post-hoc justifications that are not substantiated
by the record. The Board seeks to apply the same analysis it
relied on at the April 8 meeting, before the announcement of the
rent forbearance, to support a rate hike that was no longer
necessary. Yet, the record lacks any reasoning for reinstating a

budgetary shortfall, since there was money available to close this fiscal gap.  By statute, the Board must fix its fees and rates "in such amount sufficient at all times so as to provide funds in an amount sufficient together with other revenues available to the board" to pay its obligations, service water system debt, and generally "place[ the water system] on a self-sustaining basis" (Public Authorities Law §§ 1045-j [1], 1045-g [4]).  This mandate does not, and cannot, include increasing a shortfall without explanation when funds are available to pay it down.

This is not to say that the Board, in furtherance of the public interest, cannot seek to provide customer relief through special programs.  For example, in the past it has implemented a reduced, alternative rate schedule for certain multi-family dwellings and class two property owners with buildings containing six or more units (the "Frontage Transition Program"), offered bill credits to account holders participating in Department of Environmental Protection lead and copper monitoring programs, and passed on administrative savings to account holders who switch to e-billing.  Similarly, the four proposals included in the Board's proposed Fiscal Year 2017 rate schedule focused on specific categories of users in need of assistance, targeting meter-billed customers, seniors with incomes below $50,000, multi-family affordable housing properties, and account holders still in the process of

transitioning to more efficient water usage.  Certainly it is for the Board to determine how best to deploy resources to address the disparate circumstances of those who use its services.  What it cannot do is change course from its original proposed rate schedule to reinstate a shortfall without first considering how using the forbearance as a credit to a class of homeowners comports with its own statutorily-defined economic and public policy goals.

While the Court may not substitute its judgment for that of the Board, we cannot ignore our responsibility to ensure the Board's rate increase is based on its independent rational judgment.  As I see it, the record lacks any indicia that the Board exercised any judgment at all.  I dissent.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Order reversed, with costs, petition dismissed, and certified question not answered as unnecessary.  Opinion by Judge Fahey. Judges Stein, Garcia, Wilson and Feinman concur.  Judge Rivera dissents in an opinion, in which Chief Judge DiFiore concurs.

Decided December 19, 2017